The People of the State of Illinois, Defendant in Error,
v. Walter Turner, Plaintiff in Error.

Gen. No. 8,337.

494

Opinion filed February 3, 1930. Rehearing denied April 4, 1930.

SAMUEL R. TURNER and THOMAS F. SMITH, for plaintiff in error.

A. W. SCHIMMEL, State's Attorney, for defendant in error.

MR. PRESIDING JUSTICE ELDREDGE delivered the opinion of the court.

At the April term, 1929, of the circuit court of Pike county, an indictment was returned by the grand jury charging Walter Turner (plaintiff in error), and Howard Robbins, in the first two counts thereof, of having burglarized the store building of one J. H. Dennis and taking therefrom a number of overalls, lumber jackets, sheep skin coats, Indian blankets, underwear, caps, corduroy pants, blue shirts, etc., and in the third count charging said parties with feloniously, unlawfully, wilfully and maliciously receiving the same said articles knowing that they had been so feloniously stolen, taken and carried away from said store building of said Dennis. A separate trial was granted to the plaintiff in error and the jury returned a verdict finding him guilty of having received the

stolen goods as charged in the third count of the indictment, the value of the same being $10. Plaintiff in error was sentenced to the Illinois State Farm at Vandalia, Illinois, for a term of eight months and to pay a fine of $400 and the costs of the suit.

J. H. Dennis was conducting a store at Chambersburg in Pike county on November 27, 1928. On the night of that day the store building was forcibly entered and the chattel property mentioned in the indictment was taken therefrom. On January 5, 1929, Mr. Dennis received an anonymous letter which was later proven to have been written by one Everett Downey who was then confined in the county jail of Cass county together with one John Stone for burglary and larceny committed by them in Arenzville in said county. Upon the receipt of this letter, Dennis and two deputy sheriffs of Pike county, Johnson and Medaris, went to the jail in Cass county and interviewed Downey. The way Dennis knew that the letter came from the jail located at Virginia in Cass county was through a postscript written on the back thereof by the sheriff of that county. On direct examination, Dennis testified, without objection thereto, that he received the above-mentioned letter and that he and the deputies, Johnson and Medaris, then went to the county jail of Cass county and interviewed Downey and as a result of that interview Dennis and the deputy sheriffs procured search warrants for the homes of Robbins and Turner (plaintiff in error). On cross-examination, in answer to questions propounded by counsel for plaintiff in error, Dennis testified that he learned the letter was written by someone confined in the county jail of Cass county from the fact that there was a postscript added on the other side of the letter from the deputy sheriff and he thought the letter was dated January 5; that he and the deputy sheriffs went to the jail and saw Downey and talked with him in the

office thereof. Then in response to the question propounded by counsel for plaintiff in error, "What did Downey say to you there?", he replied, "He says, 'I suppose you want to know who is mixed up in this case.' He first said he and Stone were concerned in the robbery. He said 'I suppose you want to know who the others were?'" Then further in cross-examination the witness was asked by counsel for plaintiff in error, "What knowledge had you that they had done it," to which he answered, "Got some information from this man Downey." On redirect examination by the State's Attorney the witness was asked, "What else did the postscript and that letter state other than where you should appear, the letter you received?" To this question objection was made and overruled and the witness answered, "Stated that this boy, he didn't mention his name at the time, and before I went over I didn't know his name. He stated that this boy was in bad, and that I had better come over and see what there was in it, what he had to say." The State's Attorney at this time asked the following question, "You may tell the jury beginning with the first, the entire conversation you had at the jail with Downey," Counsel for plaintiff in error then objected on the ground that such conversation was not binding on Turner. The court overruled the objection, stating, "You went into it, and they are entitled to the balance of it." The witness then testified as follows: "We asked at the sheriff's office for this boy that had written over and he brought Downey up from the cell I suppose. He brought him to the office and he had on a pair of overalls and a cap and a pair of corduroy pants, and he says, 'Are you Mr. Dennis?' I told him I was. He says, 'I suppose you want to know something about this robbery at your place.' I told him I did and asked him if he was implicated in it, in this burglary, and he said he was, and he said, 'Bud Stone is also implicated,' and he says, 'You want to know

who the other two are?'—I said, 'yes,'—he said, 'Howard Robbins and Walter Turner.'" Thereupon counsel for plaintiff in error objected to the answer and moved to have it stricken which motion the court overruled. The witness then continued in substance as follows: "Then we went into the matter of the stolen goods and he told me about the caps. He said, 'We got six caps, and we got four pair of corduroy pants, and we got ten or twelve shirts,' and then he said, 'We got a shawl, and then we got some Indian blankets, and there were some shirts and the watches.' He said they got some watches and they got a clock, and I don't recall what else there was. Two sheep-lined coats, some cigarettes and cartridges and some lumber jackets. We talked in a general way about the robbery. And he wanted to know if I wanted the names of these other two men and mentioned Howard Robbins and Walter Turner. Then I believe he went on to relate how they divided the goods. I believe he said they had given one of the blankets, the Indian blankets, to Robbins, and one to Turner, and that Turner had gotten one pair of corduroy pants. That is just as I remember it. That he and Stone had taken the sheeplined coats and a pair each of corduroy pants. And I believe he said that he, Downey, got two of the watches and that they divided this stuff up at Turner's house, divided it as near equally as they could. He said Turner got the cartridges and Robbins got one of the lumber jackets."

All the above testimony in relation to the receipt of the anonymous letter, the actions of the officers in going to the county jail of Cass county and the interview with Downey and what Downey said in regard to the participation of the plaintiff in error in the burglary was wholly incompetent and Downey's statements were purely hearsay. It is true that on cross-examination, counsel for plaintiff in error did ask some questions in regard to the date of the letter and how the

witness found out that it was from Downey. But in our opinion this was not sufficient to open the door on redirect examination for all the conversation the witness had with Downey in regard to the commission of this crime implicating plaintiff in error and the objection made thereto by counsel should have been sustained. Counsel for plaintiff in error should have objected to all this incompetent evidence which was introduced on the direct examination of the witness in regard to the receipt of the letter by the witness and the actions of the officers pursuant thereto.

The deputy sheriffs, Medaris and Johnson, together with Dennis, after procuring search warrants authorizing the search of the house of plaintiff in error, went to the premises and made a search but found none of the goods alleged to have been stolen. They arrested the plaintiff in error and brought him to the jail in Pike county. They also arrested Robbins and placed him in the jail.

After the plaintiff in error was arrested he was taken to the county jail in Pike county and was subjected to an examination in the presence of the sheriff, deputy sheriffs, Medaris and Johnson, and the State's Attorney. At this interview with the officers he denied having had anything to do with the burglary or receiving the property. Robbins, who, it appears, had previously confessed his participation in the crime, was then brought into the presence of the plaintiff in error and made to repeat his confession and detail all the circumstances of the crime and in which he stated that Turner participated therein. In regard to this examination Medaris testified in substance as follows: "I brought him down in the office to talk and he denied the charge and I asked him if he had anything to do with it. He said he didn't." On cross-examination he testified: "The next conversation I had with him was the next morning in the jail office. If I remember

right there was present Mr. Johnson, Mr. Turner, Mr. Schimmel and myself. He said he didn't have anything to do with it. I think the State's Attorney asked him questions about this burglary. I asked him. I brought him up for the purpose of questioning him. The first question I asked him in the jail office was, 'Walt, did you have anything to do with this stuff?' He said, 'I've been framed.' That is all I could say. The sheriff said, 'Lead him back to his cell.' I talked to him every day but not about the burglary. That is all the talk I have had with him.'' Neither the sheriff nor Robbins testified in the case. Johnson, the other deputy sheriff who was present at this examination or interview, on direct examination testified in substance as follows: ''Robbins had admitted it before and claimed that they burned the stuff the night before we got there out at Turner's house. Turner denied being into Robbins'. He went into town to get some medicine which was for him. He admitted being down to Howard Robbins' house that night and telling him about the message he got from the sheriff, and that afterward said they went out to Turner's house and burned the stuff, also took Robbins' stuff out there to Turner's. That was the night of the first day we were over there; it was the night they went out to Turner's, was the night of the first day we were over to Virginia. I don't recall any other statements that Turner made regarding the burglary at that time.'' On cross-examination he testified as follows: ''Turner denied that he had had anything to do with the burglary until he heard the confession made by Robbins when he admitted being down to Howard Robbins' and said the sheriff told him the night before we were coming. He admitted taking the stuff. He did admit taking this stuff at Robbins' out to his house, and he and Robbins burning it up in the cook stove. He said that, well, he had been down to Howard Robbins' house; he had been

into Beardstown to see a doctor, had a sore foot and went in to get some medicine, and that he did go down to Robbins' house and told him about seeing the sheriff and getting word that we would be there the next day to search the place. And that they also gathered up the stuff and took it out to Turner's house and they burned what stuff was there." It is very strange that one deputy sheriff should testify that during all this examination of the plaintiff in error that he denied any participation in the crime whatever and that the other deputy sheriff who was present should testify that he substantially admitted all the facts stated by Robbins. Either one or the other is mistaken as to what Turner did admit, if he admitted anything. As stated before, the sheriff himself, who was present, was not placed on the stand as a witness and gave no testimony in regard to this interview. The whole procedure was staged for the express purpose of getting a confession out of the plaintiff in error by having Robbins personally detail all the facts of the crime in the presence of the plaintiff in error and the evidence of the two deputy sheriffs can in no way be reconciled. Up to this time, it is admitted that the plaintiff in error had at all times denied his guilt and had insisted that he had had nothing to do with the robbery or the burning of the goods at any time. The plaintiff in error himself testified that he never confessed at this time nor at any other time to the facts as told by Robbins and in this he is supported by the testimony of Medaris, the other deputy sheriff who was present. The plaintiff in error claims that he was hard of hearing and did not hear all that Robbins and the others said and it is undisputed that he was partially deaf. An admission or confession made by an accomplice in the presence of the defendant charging the latter with the guilt of a crime, when the latter then and there denies it, is not admissible against him. *People v. Montgomery,* 271 Ill. 580. Before an admis-

sion or confession made by an accomplice in the presence of defendant is admissible, the facts and circumstances in evidence must show that the defendant heard and understood the admission or confession. *People v. Rischo,* 262 Ill. 596.

On the theory that the plaintiff in error had confessed that he was guilty of the crime in the manner described by Robbins, the court permitted Johnson to testify as to what Robbins said which was as follows: "He said he took Bud Stone out to Turner's on the night Mr. Dennis' store was robbed, out to Turner's place. Everett Downey was there and wanted them to go to Chambersburg to help rob the store, and the four of them went to Beardstown, crossed the river and went through Rushville and into Chambersburg, only making one stop at a filling station along the road and filled up with gas and on into Chambersburg and left the car which was Robbins' car, a Chevrolet touring car, and left it at the levee about six or seven blocks from Dennis' store, and Turner stayed with the car, and the other three, Downey, Robbins and Stone, went to the store and broke in and got the goods, and wrapped them up in three Indian blankets and carried them back to the car and Turner was still there waiting for them, watching the car, and from there they went back to Beardstown, never made but one stop, and that was on the bridge to turn in the ticket and from there to Turner's house, and unloaded this stuff into a Ford truck about 5 o'clock in the morning. They ate breakfast at Turner's, and Robbins went back to town and went to work on the section where he worked all the time. About a week after that they went out to Turner's house and got his part of the stuff that that other three had left. He went out and got what stuff he was supposed to get."

Under the facts as developed by the evidence, we believe that the trial court erred in admitting the

above testimony for the reason that the evidence does not sufficiently show that the plaintiff in error heard and understood the account of the burglary as made by Robbins or that he did in fact make any admissions of his guilt. If we are correct in this, then the admission of the above testimony was erroneous and extremely prejudicial to the interest of the plaintiff in error as the only competent testimony which could connect the plaintiff in error with the crime was that given by Downey, himself, who testified in substance to the facts as set out in the confession of Robbins. As against this testimony of Downey are the following facts. He, himself, was a confessed accomplice and also an habitual criminal. The plaintiff in error was a farmer and lived about 6 miles from Beardstown in Cass county and had lived in that county all his life, in the same vicinity for 18 years and on the same farm for 8 years and at the time of the crime his family consisted of his wife and 3 daughters. He also had another daughter who was married to George Miller, who resided about 3 miles distant from his home. The plaintiff in error testified that about dusk after his family had had supper on the night that the burglary was committed, he, together with his wife and his daughters, Mary, Dorothy and Louise, went to the home of George Miller, his son-in-law, and arrived there about 8 o'clock that evening; that he went there for the purpose of procuring some articles which Mrs. Miller had ordered through a mail order house for him and his family; that they spent the evening in visiting and listening to the music from a phonograph and started home about 11 o'clock and had traveled a distance of about a quarter of a mile when his automobile became stuck in a mud hole on the road whereupon he returned to the home of Miller and requested him to take his tractor and pull him out of the mud hole and that the latter filled the radiator on the tractor, proceeded to the place where the automobile

was held fast and pulled the same out of the mud hole; that this took about an hour and on account of the delay he did not arrive home until about 1 o'clock in the morning when he and his wife and daughters retired. In this he is corroborated by Mr. and Mrs. Miller and two of the daughters. He is further corroborated by John Jokisch, a deputy sheriff of Cass county, who testified that he passed the automobile of the plaintiff in error and his family on the night in question on his return home from calling upon a young lady. He stated that he left the place where he was visiting about 12 or 12:15 that night and overtook plaintiff in error's automobile within a half mile of that place; that he recognized plaintiff in error's car and as he passed the plaintiff in error called him by name and he recognized his voice. He fixes the date as follows: ''Why, the purpose I went down to her house was to make a date to take her to a box supper at Black Oak School. We made arrangements on the night of the 28th. The following day after the 28th we were making preparations to go to Pekin for Thanksgiving dinner.''

Plaintiff in error also produced a number of witnesses among his neighbors who testified that his general reputation in the community where he resided as to being a law-abiding citizen was good. The plaintiff in error further testified that the witness, Downey, had before that time been employed by him on his farm and had been discharged.

One of the defenses in this case is that of an alibi. The court gave on behalf of the defendant in error the following instruction: ''You are instructed that the defense of an alibi, to be entitled to consideration, must be such as to show that at the very time of the commission of the crime charged, the accused was at another place, so far away or under such circumstances that he could not, with any ordinary exertion, have reached the place where the crime was committed

so as to have participated in the commission thereof.'' In regard to a similar instruction in the case of *People v. Fisher,* 295 Ill. 250, the court held: ''The substance of it is that his defense of alibi is not entitled to any consideration unless the evidence shows a complete and perfect alibi, and the instruction was likely to be taken by the jury as an intimation from the court that the evidence on the question was not of that character to warrant them in considering it. The rule of law on the question of an alibi is the same as that for all other defenses. The defendant is only required to offer sufficient evidence on that question to raise in the minds of a jury of reasonable men a reasonable doubt of his guilt. He is entitled to full and fair consideration of his evidence upon any defense he may seek to make. This instruction is of the same character as one given for the People in *Waters v. People,* 172 Ill. 367, the giving of which was held by this court to be reversible error. We hold that it is reversible error in this case, where the evidence is very conflicting.''

If the evidence in regard to the alibi is true, then the plaintiff in error is not guilty of the crime charged. It was not necessary that the jury should believe that the defense of alibi was conclusively proven but only that it should raise a reasonable doubt in their minds as to the guilt of the plaintiff in error.

The judgment, however, must be reversed for another reason. While it is true that an indictment can charge burglary and receiving stolen goods in separate counts, yet, each offense is a distinct crime in itself' and if the proofs conclusively show that a defendant so charged can be guilty of but one of them he cannot be convicted of the other offense. All the evidence in this case for the People, both competent and incompetent, shows that the defendant together with Robbins, Stone and Downey, went in an automobile to Chambersburg for the sole purpose of robbing the store in question. It all shows further that when they

arrived in the vicinity of the store the plaintiff in error remained in the automobile to watch the same while his three accomplices actually entered the store and took the goods therefrom and after which they divided the goods among themselves. If this evidence is true, then plaintiff in error aided and abetted the other three in the commission of the burglary and was a principal with his accomplices in the commission of the crime of burglary and if he is guilty of anything he is guilty of that crime. In the case of *People v. Dalke,* 336 Ill. 446, it is held: "Before there can be a conviction for receiving stolen property the evidence must show, beyond a reasonable doubt, that the property has, in fact, been stolen by a person other than the one charged with receiving the property; that the one charged with receiving it has actually received it or aided in concealing it; that the receiver knew that the property was stolen at the time he received it, and that he received the property for his own gain or to prevent the owner from again possessing it." In this opinion the court quotes from the case of *People v. Ensor,* 310 Ill. 483, as follows: "Granting that the evidence justifies the conclusion that the automobile in question was in fact stolen and that it was found shortly thereafter in the possession of plaintiff in error, the presumption against plaintiff in error would be that he stole it himself. One person cannot be *both* the thief and the receiver of stolen property. He cannot receive stolen property from himself."

If the plaintiff in error aided and assisted his three accomplices in the breaking and entering of the store building and in the larceny of the goods therefrom, then he is as guilty of burglary as his accomplices and he could not receive the stolen goods from himself.

The judgment of the circuit court of Pike county is reversed.

*Reversed.*